UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENOLIS COLEMAN,

          Plaintiff,        Civil Action No. 18-12881
                                Honorable Paul D. Borman
v.                              Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 11]**

Plaintiff Denolis Coleman ("Coleman") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #10, #11), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Coleman is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment (**Doc. #11**) be **DENIED**,

Coleman's Motion for Summary Judgment (**Doc. #10**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

## II. REPORT

### A. Background

Coleman was 53 years old at the time of her alleged onset date of January 30, 2015, and at 5'6" tall weighed approximately 220 pounds during the relevant time period. (Tr. 52, 233). She completed high school and took some college classes but did not earn a degree. (Tr. 52, 234). She worked as an administrative assistant at accounting firms for more than twenty years, until January 30, 2015, when she felt she could no longer concentrate well enough after suffering a stroke to perform her job duties. (Tr. 55, 233-34, 250). She has been receiving long-term disability benefits through her employer since that time, and now alleges disability primarily as a result of the lasting effects of that stroke. (Tr. 54-55, 233, 242).

After Coleman's application for DIB for was denied (Tr. 120-23, 125-30), she timely requested an administrative hearing, which was held on May 12, 2017, before ALJ Kari Deming (Tr. 45-77). Coleman, who was represented by attorney Linda Caruso, testified at the hearing, as did vocational expert Elizabeth Pasikowski. (*Id.*).

On August 14, 2017, the ALJ issued a written decision finding that Coleman is not disabled under the Act. (Tr. 28-39). On July 17, 2018, the Appeals Council denied review. (Tr. 1-5). Coleman timely filed for judicial review of the final decision on September 14, 2018. (Doc. #1).

The Court has thoroughly reviewed the transcript in this matter, including Coleman's medical record, Function and Disability Reports, and testimony as to her conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### B.     The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

3

>Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
>Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
>Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
>Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Coleman is not disabled under the Act. At Step One, the ALJ found that Coleman has not engaged in substantial gainful activity since January 30, 2015 (the alleged onset date). (Tr. 30). At Step Two, the ALJ found that she has the following severe impairments:  late effects of cerebrovascular accident ("CVA"), hypertension,

4

obstructive sleep apnea, and depression/anxiety related to history of CVA. (*Id.*). At Step Three, the ALJ found that Coleman's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 31).

The ALJ then assessed Coleman's residual functional capacity ("RFC"), concluding that she is capable of performing medium work, with the following additional limitations: can frequently stoop, crouch, crawl, kneel, and climb ramps and stairs; can never be exposed to workplace hazards, such as ropes, ladders, scaffolds, or unprotected heights; and is limited to simple, routine tasks. (Tr. 32).

At Step Four, the ALJ found that Coleman is not capable of performing any of her past relevant work. (Tr. 37). At Step Five, the ALJ determined, based in part on testimony provided by the vocational expert in response to hypothetical questions, that Coleman is capable of performing the jobs of packer (63,000 jobs nationally), assembler (71,000 jobs), and cleaner (51,000 jobs). (Tr. 38). As a result, the ALJ concluded that Coleman is not disabled under the Act. (Tr. 39).

    **C.**   **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the

record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

6

even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**D.    Analysis**

As set forth above, the ALJ determined, in relevant part, that Coleman retains the RFC to perform a reduced range of medium work, with a limitation to only simple, routine tasks. (Tr. 32). Coleman now argues that the ALJ's finding in this respect does not adequately account for her ongoing memory deficits. (Doc. #10 at 13-23). For the reasons set forth below, the Court cannot find that substantial evidence supports the ALJ's RFC finding because it is based on an obviously incomplete medical record.

*1.    The Relevant Medical Evidence*[1]

In evaluating the adequacy of the ALJ's RFC finding, a discussion of the relevant medical evidence is necessary. In October 2014, Coleman presented to the emergency room complaining of a headache and reporting that coworkers "thought that her face was drooping at work[.]" (Tr. 347-49). An MRI/MRA showed a subacute infarction, consistent with a stroke (Tr. 353-54, 358-39), and Coleman was advised to follow up with a neurologist (Tr. 355-56). On October 21, 2014, Coleman

---

[1] Because Coleman does not challenge the ALJ's assessment of her physical functioning, the Court will focus its discussion on evidence pertaining to Coleman's mental impairments.

saw neurologist Matthews Gwynn, M.D. (Tr. 374-77). Coleman denied memory trouble; her attention, concentration, and other cognitive functions appeared normal on examination; and she was cleared to return to work.[2] (Tr. 375-76).

A few months later, however, on January 29, 2015, Coleman's husband brought her to the emergency room because she was "not herself." (Tr. 412-16). She and her husband reported symptoms of confusion and urinary incontinence, but a neurological examination was normal, and a head CT was negative. (*Id.*). On February 18, 2015, Coleman returned to see Dr. Gwynn, reporting that she was having trouble performing her job because she "cannot concentrate well." (Tr. 371). Dr. Gwynn observed that Coleman walked with a very slight limp, but her attention and concentration appeared normal, and she showed no other neurological deficits. (Tr. 372-73). Dr. Gwynn referred Coleman for neuropsychological testing and opined that, in the meantime, it was "probably wise for her to refrain from work that might risk errors from her stated concentration trouble." (Tr. 373).

On March 5 and 12, 2015, Coleman underwent a thorough neuropsychological evaluation with Jason King, Ph.D. (Tr. 383-90). She reported slurred speech, facial droop, incontinence, bilateral foot dragging, confusion, and memory problems, saying she could not remember required work procedures and

---

[2] As the ALJ noted, Coleman did return to work for a period of time, but she "had difficulty performing her job adequately because of concentration deficits." (Tr. 33).

8

had made many mistakes at work. (Tr. 384). On mental status examination, she was fully oriented, pleasant, and cooperative. (Tr. 385). Dr. King then administered a series of cognitive tests, which showed "significant impairments in multiple cognitive domains," including moderate impairment of anterograde memory, with deficits in all aspects of memory processes; mild to moderate impairment of executive abilities; and mild impairment of attention. (Tr. 386). He diagnosed Coleman with mild neurocognitive disorder due to stroke and mild anxiety disorder and indicated that she "may benefit from strategies to compensate for attention and memory problems." (Tr. 386-87). Dr. King also recommended that, considering the degree of Coleman's cognitive impairment, she discontinue driving, as she was at "an increased risk of being in an accident while driving an automobile." (Tr. 387). On April 1, 2015, Dr. King completed a medical source statement, opining that Coleman had a "major cognitive impairment" and was incapable of even low stress jobs. (Tr. 392-94).

Coleman returned to see Dr. Gwynn on April 20, 2015, at which time he acknowledged Dr. King's assessment that "she is unable to work due to cognitive dysfunction," as well as his plan "to reassess her in six months to see if it is possible for her to return to work at some capacity." (Tr. 395). On examination, Coleman was able to focus and had an appropriate attention span; her speech was clear; and her short and long-term memory were grossly intact. (Tr. 397). Dr. Gwynn

9

indicated that Coleman should continue on a "medical leave of absence due to stroke" and that he would "reassess [that] status in October after repeat neuropsych testing to determine if she is capabl[e] of returning to work." (Tr. 398).

Coleman did not return to Dr. Gwynn; instead, on September 15, 2015, she went to neurologist Douglas Stuart, M.D. for a second opinion. (Tr. 450-51). Dr. Stuart noted that there was "presently some question regarding [Coleman's] candidacy for disability and her ability to return to work." (Tr. 450). Dr. Stuart expressed a need to review Dr. Gwynn's notes and Coleman's MRI, but indicated he was sending her for "formal neuropsych testing" with "Dr. Shindell." (Tr. 451). Three months later, Coleman returned to Dr. Stuart, who noted that she "continues to have significant cognitive impairments" that were "confirmed by neuropsychological testing with Dr. Steven Tindell" and that she would "need to apply for long-term disability." (Tr. 449). The reports of this neuropsychological testing are not contained in the record, however.

Subsequently, Coleman moved from Georgia to Michigan and established care at Henry Ford. On June 10, 2016, Coleman saw Shannon Fritz, D.O., a resident, reporting that she had been on disability since June 2014 after suffering a stroke, and that she had an appointment scheduled with a neurologist, "Dr. Turner,"[3] in two weeks. (Tr. 503). Dr. Fritz reportedly completed "disability paperwork" (Tr. 504),

---

[3] There are no records from "Dr. Turner" in the administrative transcript.

10

but that paperwork is not included in the record.

In July 2016, Coleman began seeing a new resident at Henry Ford, Janet Adedokun, D.O. (Tr. 500-02). On July 29, 2016, Coleman presented to Dr. Adedokun for "completion of paperwork for activities of daily living that is needed for her insurance." (Tr. 497). At the end of that visit, Coleman was advised to "continue to follow up with Dr. Turner as directed[.]" (Tr. 498). Again, however, there are no records from Dr. Turner in the transcript.

At a follow-up visit to Dr. Adedokun on January 20, 2017, it was again noted that "the patient follows with Dr. Turner as she has a history of strokes. Per Dr. Turner's last note in the chart, she was supposed to follow up with him after getting her MRI done however she has to do." (Tr. 483). Coleman also was directed to "follow up with Dr. Turner as he wanted her to do some neuropsychiatric testing[.]" (Tr. 485). A supervising physician, Nicholas Gadzinski, D.O., co-signed Dr. Adedokun's progress note, indicating that he "saw and evaluated the patient with the resident …." (Tr. 483). During her next visit with Dr. Adedokun, on February 10, 2017, Coleman brought in "disability paperwork," which Dr. Adedokun and Dr. Gadzinski indicated would be completed "in a week." (Tr. 479-81). Although the record does not contain this "disability paperwork," Coleman's pre-hearing brief does reference a February 16, 2017 medical source statement completed by Dr. Gadzinski. (Tr. 330). This treating source opinion purportedly noted that Coleman

11

suffers, in relevant part, from the following limitations:

- Claimant will experience instances of pain and other symptoms severe enough to interfere with the attention and concentration needed for even simple work tasks;

- Claimant has a reduced stress tolerance leaving her incapable of even "low stress" jobs; and

- Claimant would be absent from work more than 4 days per month due to her conditions.

(*Id.*). When asked about this medical opinion at the hearing, Coleman indicated – apparently incorrectly – that she did not know who Dr. Gadzinski was and had never seen him. (Tr. 49). Her attorney then indicated that the reference to this opinion in the pre-hearing brief must have been "a mistake." (*Id.*).

2. *Remand is Required, as the Record is Glaringly Incomplete*[4]

While the claimant bears the ultimate burden of establishing that she is entitled to disability benefits, courts have recognized that social security proceedings are "inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). As a result, an ALJ has an affirmative duty to develop the factual record upon which her decision rests, regardless of whether the claimant is represented by legal counsel at the administrative hearing. *See Lashley v. Sec'y of Health & Human Servs.*, 708

---

[4] Coleman did not specifically articulate an argument regarding the incompleteness of the administrative record. However, "that does not prevent the Court from identifying error based on its own review of the record, and ruling accordingly." *Buhl v. Comm'r of Soc. Sec.*, No. 12-10087, 2013 WL 878772, at *7, n. 5 (E.D. Mich. Feb. 13, 2013). *See also Miaun v. Colvin*, No. 3:14-CV-222-TAV-HBG, 2015 WL 2248750, at *14 (E.D. Tenn. May 12, 2015) ("[T]he Court may address an issue *sua sponte* should it find error upon review.").

F.2d 1048, 1051 (6th Cir. 1983) (citing *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (recognizing that the responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge)); *see also Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261-62 (S.D.N.Y. 2016) ("The ALJ must develop the record even where the claimant has legal counsel.").

Courts have recognized that, "Failure by an ALJ to fully develop the factual record in a particular matter is often evidenced by superficial or perfunctory questioning, as well as a *failure to obtain all available medical records and documentation.*" *Vaca v. Comm'r of Soc. Sec.*, No. 1:08-cv-653, 2010 WL 821656, at * 6 (W.D. Mich. Mar. 4, 2010) (emphasis added) (citing cases). Indeed, courts have explicitly stated: "'An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing.'" *Figard v. Comm'r of Soc. Sec.,* No. 1:09-cv-425, 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010) (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)); *see also Kendall v. Astrue*, No. CIV. A. 2:10-263-DCR, 2011 WL 4388794, at *5 (E.D. Ky. Sept. 20, 2011) ("[w]here there are obvious gaps in the record, the ALJ has the duty to develop the administrative record with respect to the missing evidence."). This is particularly true in situations where the ALJ's duty to develop the record intersects with the "treating physician rule," which requires an ALJ to give controlling weight to the opinions of a claimant's treating physicians,

13

so long as those opinions are well-supported by clinical evidence and not inconsistent with the other substantial evidence in the record. *See, e.g., Williams v. Barnhart*, No. 05 Civ. 7503 (JCF), 2007 WL 924207, at *7 (S.D.N.Y. Mar. 27, 2007) (citing 20 C.F.R. § 404.1527).

In this case, the ALJ fell short of her obligation to obtain all relevant medical records and pertinent documentation. Indeed, as set forth above, it appears from a review of the administrative record that some of the most critical medical evidence that should have been considered by the ALJ was missing. As the ALJ acknowledged, neuropsychological testing conducted by Dr. King in March 2015 showed "significant impairments in multiple cognitive domains" (Tr. 33), and Dr. King opined that Coleman was incapable of even low stress jobs (Tr. 392-94). It appears, however, that there are several omissions from Coleman's subsequent medical records. For instance, when Coleman saw her treating neurologist, Dr. Stuart, in December 2015, he specifically indicated that she "continues to have significant cognitive impairments" that were "confirmed by neuropsychological testing with Dr. Steven Tindell." (Tr. 449). The transcript contains no records from Dr. Tindell, however, and the results of this testing are unknown.[5]

---

[5] The ALJ seemed to use this as a basis for finding Coleman not disabled, noting that "the record is devoid of any examination notes or clinical/diagnostic findings from Dr. Tindell." (Tr. 35). Yet, despite knowing that such records at least apparently existed, the ALJ did not question Coleman about them or make any apparent effort to obtain them.

Even more significant, however, is the glaring absence of records pertaining to Coleman's neurological treatment after she moved from Georgia to Michigan in May of 2016. Indeed, in discounting the functional impact of Coleman's cognitive impairments, the ALJ specifically noted that, since that time, Coleman had "treated exclusively with Dr. Janet Adedokun, an internist" and had not "sought or received neurological treatment[.]" (Tr. 35). In reality, however, the record suggests just the opposite. On June 10, 2016, Coleman indicated that she had an appointment scheduled with a neurologist, "Dr. Turner," in two weeks. (Tr. 503). At a follow-up visit to Dr. Adedokun on July 29, 2016, Coleman was advised to "*continue* to follow up with Dr. Turner as directed" (Tr. 498 (emphasis added)), which certainly suggests that she had already seen Dr. Turner. Moreover, on January 20, 2017, Dr. Adedokun noted that "the patient follows with Dr. Turner"; she specifically referenced "Dr. Turner's last note in the chart"; and she indicated that Dr. Turner "wanted [Coleman] to do some neuropsychiatric testing." (Tr. 485). Thus, where the evidence of record indicates that Coleman was in fact treating with a neurologist in Michigan, it was incumbent upon the ALJ to ensure that such medical evidence was made part of the administrative record.

Similarly, as set forth above, Coleman's pre-hearing brief references a February 16, 2017 medical source statement completed by one of her treating physicians, Dr. Gadzinski. (Tr. 330). This opinion ostensibly noted, in relevant part,

15

that Coleman "will experience instances of pain and other symptoms severe enough to interfere with the attention and concentration needed for even simple work tasks"; and that she "has a reduced stress tolerance leaving her incapable of even 'low stress' jobs[.]" (*Id.*). To the ALJ's credit, she asked Coleman about this medical opinion at the hearing, and Coleman indicated that she did not know who Dr. Gadzinski was and had never treated him. (Tr. 49). The problem, however, is that the record evidence demonstrates just the opposite – namely, that Coleman saw Dr. Gadzinski on at least two occasions, such that he was familiar with her medical impairments and resulting limitations. (Tr. 479-81, 483). And, while an ALJ might, in most instances, be able to rely on a claimant's testimony that she had not treated with a particular physician, that simply is not the case here, where Coleman's disability is cognitive in nature, where she suffered from ongoing memory loss, where her representative's pre-hearing brief quoted from a purported medical opinion in detail, where the medical records before the ALJ belie Coleman's testimony that she never treated with Dr. Gadzinski, and where the record was obviously incomplete in the other respects identified above.

Again, while Coleman was represented by counsel throughout the administrative proceedings, the Commissioner "bear[s] a responsibility for adequate development of the record in these cases." *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 142 (1st Cir. 1987); *see also Atkinson v. Barnhart*, 87 F. App'x

766, 769 (2d Cir. 2004) (affirmative duty to develop administrative record is present even when claimant is represented by counsel). Under the circumstances, there can be little question that the missing medical evidence is relevant, as it directly pertains to the effects of Coleman's cognitive impairments during the relevant period of time. Nevertheless, both counsel and the ALJ failed to recognize that there were substantial gaps in the medical evidence (including the results of Dr. Tindell's neuropsychological testing, treatment records from Dr. Turner, and Dr. Gadzinski's medical source opinion). Given all of these facts, the Court simply cannot find that the record was adequately developed so as to ensure a full and fair hearing, and a decision supported by substantial evidence. *See Figard*, 2010 WL 3891211, at *7. Accordingly, remand is warranted for completion of the record and further evaluation of Coleman's mental impairments.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #11**) be **DENIED**, Coleman's Motion for Summary Judgment (**Doc. #10**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

Dated: March 4, 2019  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 4, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
